## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTHONY SMITH, AMELIA CARTER, ANTHONY JAMES, BEDJY JEANTY, CATHERINE HEITE, CHRISTINA GARCÉS, CORA ISOM, ELAINE HOLTON, EMILY NEIL, ISA RICHARDSON, JOHANA RAHMAN, JOSEPH MOYER, JUDITH PALMER, KETTY RICHARD, MARIE JOHNSON, MARQUIS RANSOM, RYAN BING, SAHAR SADEGHI, SERGIO CEA, and SHAHIDAH MUBARAK-HADI, | No. 2:20-cv-03431 |
| Plaintiffs, | **FIRST AMENDED COMPLAINT** |
| v. | Jury Trial Demanded |
| CITY OF PHILADELPHIA, OFFICERS JOHN DOES #1-#100, | |
| Defendants. | |

## <u>INTRODUCTION</u>

1.      Plaintiffs Anthony Smith, Amelia Carter, Anthony James, Bedjy Jeanty, Catherine Heite, Christina Garcés, Cora Isom, Elaine Holton, Emily Neil, Isa Richardson, Johana Rahman, Joseph Moyer, Judith Palmer, Ketty Richard, Marie Johnson, Marquis Ransom, Ryan Bing, Sahar Sadeghi, Sergio Cea, and Shahidah Mubarak-Hadi bring this civil rights action to seek redress for the violation of their constitutional rights to be free from racial discrimination, excessive force, and to peacefully demonstrate without the threat of police violence, after being attacked without provocation by the Philadelphia Police Department ("PPD") on May 31, 2020, in the West Philadelphia neighborhood where many of them reside.

2.      On May 25, 2020, George Floyd, a Black man, was killed in Minneapolis, Minnesota by a police officer who kneeled on his neck for eight minutes and forty-six seconds,

while he was already on the ground, handcuffed and restrained. Three officers stood by watching as Mr. Floyd pleaded, "I can't breathe"—echoing the final words of Eric Garner, a Black man killed by a New York City Police Department officer six years earlier.

3.      In the weeks following Mr. Floyd's killing, citizens of Philadelphia, as in other parts of the country, protested and demanded a change to police practices that have resulted in the loss of countless Black lives, including the recent killings of Breonna Taylor and Mr. Floyd, and which profoundly impact Black people's welfare and sense of security in their own communities.

4.      On May 31, 2020, as protesters gathered in the predominantly Black 52nd and Market Street area of West Philadelphia (the "52nd Street Community"), the PPD arrived en masse in armored vehicles, in response to limited reports of isolated looting, and without provocation repeatedly unleashed a variety of dangerous military style munitions, including rubber bullets, tear gas, and pepper spray, against protesters, residents and bystanders throughout the neighborhood.

5.      This dangerous force was not limited to the stores, or even the street, where the looting had allegedly occurred. Rather, PPD officers, outfitted in full body armor, went up and down residential streets in the neighborhood, launching tear gas canisters and firing rubber bullets at residents and passersby who were doing nothing more than sitting on their porches or walking home from work, causing residents—including elderly residents and children—to seek shelter at home or wherever they could nearby. Many residents were seriously injured, requiring medical treatment and in some cases hospitalization. Some residents had to evacuate their own homes due to the impact of tear gas entering through windows or under doorways.

6.      In the evening of May 31st, members of the 52nd Street Community and members of Philadelphia Coalition for Racial Economic and Legal Justice ("Philly for REAL Justice"), a grassroots organization formed to eliminate systems of white supremacy and police terror,

gathered to demonstrate against the police violence that had just occurred in their community. Plaintiffs Isa Richardson, Johana Rahman, Anthony Smith, and other community members were present at this gathering and peacefully demonstrated.

7.     The peaceful demonstrators were met with the very police violence they sought to protest. By nightfall, the demonstrators had dwindled to a small group of approximately 20 people, yet police officers, who outnumbered civilians, without warning or use of other de-escalation tactics, again attacked the demonstrators and residents with munitions, including tear gas, pepper spray, and rubber bullets, and in some cases arrested participants and bystanders.

8.     PPD's use of military weapons in West Philadelphia was authorized by the highest levels of the City's government, including by Mayor Kenney and PPD Commissioner Danielle Outlaw, who failed, with deliberate indifference, to ensure that police would not use these tactics in an aggressive and unlawful manner.

9.     The PPD did not target any predominantly white neighborhoods for similar treatment on May 31st, or at any later time. To the contrary, in predominantly white neighborhoods, such as Center City and Port Richmond, where there was allegedly looting of commercial enterprises, and in Fishtown, where there were reports that residents engaged in dangerous and violent conduct, tear gas was not deployed and residents were not subjected to police force, or detention and arrest for unlawful conduct.

10.     The use of militarized police violence against the 52nd Street Community violated Plaintiffs' Fourth Amendment rights to be free from unwarranted seizures and excessive force and their Fourteenth Amendment right to be free from racially discriminatory treatment by the police.

11. The excessive use of force by police was also in retaliation for the exercise of First Amendment rights, including freedom of speech and assembly, by Plaintiffs and Black residents of the 52nd Street Community.

12. Plaintiffs bring this civil rights action to secure (1) a declaratory judgment that the use of force that occurred in this case, was unconstitutional and a violation of the relevant civil rights laws; (2) compensatory damages for the injuries caused by Defendants' unlawful conduct; and (3) punitive damages assessed to deter such intentional or reckless deviations from well-settled constitutional law.

<u>JURISDICTION AND VENUE</u>

13. This action arises under the First, Fourth and Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. § 1983; Title VI of the Civil Rights Act, 42 U.S.C. § 2000d et. seq.; and Pennsylvania state law.

14. The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343, and 1367.

15. This Court is the proper venue pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in the Eastern District of Pennsylvania.

<u>PARTIES</u>

I.     **Plaintiffs**

16. Plaintiff Bedjy Jeanty is a 32-year-old Black man who lives in the 52nd Street Community and has been a resident in the broader West Philadelphia area for approximately 20 years.

17. Plaintiff Ketty Richard is a 24-year-old Black woman who lives in North Philadelphia and was in the 52nd Street Community on May 31st to attend a demonstration.

18.     Plaintiff Joseph Moyer is a 33-year-old white man who lives in the 52nd Street Community and has been a resident for over two years. He has been a resident of West Philadelphia for four years.

19.     Plaintiff Ryan Bing is a 39-year-old white man who lives in the 52nd Street Community and has been a resident for approximately seven years.

20.     Plaintiff Shahidah Mubarak-Hadi is a 32-year-old Black woman who recently moved to the 52nd Street Community.

21.     Plaintiff Marie Johnson is a 55-year-old Black woman who lives in the 52nd Street Community and has been a resident for her entire life.

22.     Plaintiff Amelia Carter is a 31-year-old Black woman who lives in the 52nd Street Community and has been a resident for approximately four years.

23.     Plaintiff Elaine Holton is a 45-year-old Black and Chinese woman who lives in the 52nd Street Community and has been a resident for approximately three years.

24.     Plaintiff Christina Garcés is a 30-year-old multiracial Latina woman who lives in West Philadelphia near the 52nd Street Community and has been a resident for approximately eight years.

25.     Plaintiff Marquis Ransom is a 28-year-old Black man who lives in the 52nd Street Community and has been a resident for approximately 15 years.

26.     Plaintiff Cora Isom is a 23-year-old Black woman who lives in the 52nd Street Community and has been a resident for her entire life.

27.     Plaintiff Catherine Heite is a 42-year-old white and Native American woman who lives in the 52nd Street Community and has been a resident for approximately 20 years. Ms. Heite is a Committeeperson in the 46th ward.

28.     Plaintiff Emily Neil is a 28-year-old white woman who lives in the 52nd Street Community and has been a resident for over two years.

29.     Plaintiff Judith Palmer is a 43-year-old white woman who has lived in the 52nd Street Community for approximately eight years.

30.     Plaintiff Anthony James is a 50-year-old Black man who lives in the 52nd Street Community and has been a resident there on and off throughout his life.

31.     Plaintiff Sahar Sadeghi is a 40-year-old South East Asian American woman who has lived in the 52nd Street Community for approximately one year and has been a resident of Philadelphia for approximately fourteen years.

32.     Plaintiff Sergio Cea is a 35-year-old Latino male who lives in the 52nd Street Community. He has been a resident of the 52nd Street Community for approximately 4 years, and of West Philadelphia for approximately 9 years. He is a Committeeperson for the 46th Ward.

33.     Plaintiff Johana Rahman is a 29-year-old South East Asian American woman who lives in West Philadelphia near the 52nd Street Community and has been a resident of Philadelphia for eleven years.

34.     Plaintiff Isa Richardson is a 39-year-old Black man who lives in the 52nd Street Community and has been a resident there on and off throughout his life.

35.     Plaintiff Anthony Smith is a 29-year old Black man who lives in the 52nd Street Community and has been a resident there on and off throughout his life.

II.     **Defendants**

36.     Defendant City of Philadelphia ("Philadelphia" or the "City") is a municipality organized and existing under the laws of the Commonwealth of Pennsylvania. The City receives federal financial assistance for its programs, services, and activities, including law enforcement.

37.     The City, acting through the Philadelphia Police Department ("PPD"), is responsible for the policy, practice, supervision, implementation, and conduct of all PPD matters, including the appointment, training, supervision, and conduct of all PPD personnel. In addition, the City is responsible for enforcing the rules and directives of the PPD and ensuring that PPD personnel obey the laws of the United States and the Commonwealth of Philadelphia. At all times relevant to this Complaint, each of the City officials referenced below, including Mayor Jim Kenney, Managing Director Brian Abernathy, and Commissioner Danielle Outlaw, was a policymaker for the City with respect to police matters. To the extent any of these or other officials is not deemed a policymaker under relevant law, each official had policymaker authority delegated to them with respect to the matters in this Complaint.

38.     Defendants PPD Officers John Does 1-100, (collectively, "Defendant Officers" or "Officers") are police officers employed by the City and other law enforcement agencies who, acting under the direction of and/or in concert and conspiracy with the City, were involved in using or directed the use of tear gas, pepper spray, and other munitions, including rubber bullets, in the 52nd Street Community on May 31, 2020. The identities of these defendants are not presently known, and Plaintiffs will amend this Complaint to properly name all defendants after preliminary discovery.

39.     At all times relevant to this Complaint, all defendants acted under color of state law and in concert and conspiracy. All defendants are jointly and severally responsible for the harms caused to Plaintiffs.

## FACTS

### III.    The 52nd Street Community

40.     The 52nd Street Community is a predominantly Black area that includes the 52nd Street commercial corridor and the surrounding Cobbs Creek and Haddington neighborhoods.

41.     Approximately 93% of both Cobbs Creek and Haddington residents are Black.[1]

42.     In the mid-1950's through the mid-1970's, the 52nd Street Corridor, spanning the 12-block corridor from Arch Street to Baltimore Avenue, was a thriving commercial and cultural center in West Philadelphia. It included movie theaters, iconic fashion stores, restaurants, and offices.[2] The 52nd Street Community was also home to the world-renowned jazz club, Aqua Lounge.[3]

43.     This commercial corridor, known as the Main Street of West Philadelphia, was surrounded by a predominantly Black residential community.

44.     The community has always included Black political and civic leaders as residents.

45.     The area is also home to the historic Malcolm X Memorial Park between Pine Street and Larchwood Avenue, a name that was selected by community members to inspire Black youth.

46.     Today, the 52nd Street Community remains a historical and cultural center in Philadelphia and hosts the City's Juneteenth Parade.

47.     The majority of businesses on 52nd Street are small or locally owned, and about one-half are Black-owned, some for multiple generations. These businesses include Hakim's Bookstore, the oldest actively operating Black-owned bookstore in the country. The 52nd Street

---

[1] *Race and Ethnicity in Cobbs Creek, Philadelphia, Pennsylvania,* STATISTICAL ATLAS, https://statisticalatlas.com/neighborhood/Pennsylvania/Philadelphia/Cobbs-Creek/Race-and-Ethnicity (last visited July 13, 2020); *Race and Ethnicity in Haddington, Philadelphia, Pennsylvania,* STATISTICAL ATLAS, https://statisticalatlas.com/neighborhood/Pennsylvania/Philadelphia/Haddington/Race-and-Ethnicity (last visited July 13, 2020).

[2] Theresa Stigale, *The Skinny-And Everything More-On 52nd* Street (Apr. 25, 2012), https://hiddencityphila.org/2012/04/the-skinny-and-everything-more-on-52nd-street/.

[3] Jason Laughlin, *West Philly's historic main street seeks a 21st-century identity,* PHILA INQUIRER (Dec. 23, 2019), https://www.inquirer.com/real-estate/commercial/52nd-street-west-philadelphia-african-american-commercial-revitalization-gentrification-concerns-20191219.html.

Community is also home to the African Cultural Art Forum, which sells Africa-inspired art and products, and Bushfire Theatre, which provides a forum for Black writers and actors in the building that was once the Aqua Lounge.[4]

48.     Despite its many assets, in recent decades, the 52nd Street Community has been impacted by economic disinvestment, and the area has struggled to regain financial prosperity.

49.     Systemic racial discrimination in the City's housing policies, including redlining, caused homes in predominantly Black areas, including the 52nd Street Community, to be valued significantly less than similar residences in predominantly white communities. This undervaluing has deprived Black families, including families in the 52nd Street Community, of rightful sources of wealth.[5]

50.     Over the last 20 years, a highly disruptive repair project on the Market-Frankford SEPTA line contributed to economic decline by creating significant barriers for those traveling into and out of the area.[6]

51.     Forty-seven businesses closed along the 52nd Street Corridor between 2000 and 2009, forcing neighborhood residents to shop elsewhere rather than contributing to the economy of their own community.[7]

---

[4] *Id.*

[5] Jason Laughlin, *In a plan for a safer, vibrant 52nd Street, worried West Philly neighbors see gentrification looming*, PHILA INQUIRER (Feb. 21, 2020), https://www.inquirer.com/news/west-philadelphia-gentrification-52nd-street-redevelopment-20200221.html.

[6] Aubrey Whelan, Justine McDaniel, Jason Laughlin & Maddie Hanna. *This West Philly Neighborhood had been struggling to rebuild. Then the looting started.*, PHILA INQUIRER (June 1, 2020), https://www.inquirer.com/news/philadelphia-protests-52nd-street-looting-george-floyd-20200531.html.

[7] Anthony Campisi. *After decades of turmoil, 52nd Street is getting a new lease on life* (March 22, 2011), https://whyy.org/articles/after-decades-turmoil-52nd-street-getting-new-lease-life/.

52.     In recent years, there has been an effort by the City to "gentrify" the 52nd Street Corridor that has been opposed by many residents who see this as an attempt to appeal to white and affluent residents and to push out Black and low-income residents through aggressive policing of Black residents and increased costs of living.[8]

## IV.     Racially Biased Policing in the City of Philadelphia and in the 52nd Street Community

53.     The City has a long history of targeting Black communities, including the 52nd Street Community, for racially discriminatory policing and unreasonable use of force.

54.     In 1963, one of the first studies on police shootings found that between 1950 and 1960, nearly 90% of the 32 men shot and killed by PPD officers were Black, even while Black people made up only 22% of the city's population.[9] Over 50 years later, in 2015, a Department of Justice report showed the statistics on excessive and disproportionate use of force remained largely unchanged, revealing that 80% of people shot by PPD officers police between 2007 and 2014 were Black.[10]

55.     One of the most horrific instances of excessive force in Philadelphia police history occurred in the 52nd Street Community on May 13, 1985, when the PPD used helicopters to drop explosives on the home of MOVE, a Black liberation group, resulting in a massive fire which caused the deaths of six adults and five children. The Philadelphia Special Investigation Commission, which investigated PPD's actions, found the police fired "'over 10,000 rounds of

---

[8] Jason Laughlin, *supra* notes 3-5.

[9] Gerald D. Robin. *Justifiable Homicide by Police Officers,* 54 J. Crim. L. & Criminology 225,                                226-29                                (1963), https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=5164&context=jclc.

[10] *See* Dain Saint, Crag R. McCoy, Tommy Rowan & Valerie Russ, *Special Report: Black and Blue,* Phila Inquirer (July 10, 2020), https://www.inquirer.com/news/inq/philadelphia-police-brutality-history-frank-rizzo-20200710.html.

ammunition in under 90 minutes at a row house containing children.'"[11] Police also fired high-pressure water hoses and tear gas canisters. The fire caused by PPD destroyed 61 neighborhood homes, leaving hundreds of people homeless.[12]

56.      The City also has a documented history of engaging in hyper-surveillance and unwarranted stops, searches, and seizures of Black residents. In 1988, the City agreed to cease unconstitutional stops and searches of young Black men during the investigation of the "Center City Stalker." *Arrington v. City of Philadelphia*, Civil Action No. 88-2264 (E.D. Pa.).

57.      In 1996, a class of plaintiffs filed *NAACP et al. v. City of Philadelphia*, No. 96-6045 (E.D. Pa.), alleging that officers of the 39th District unlawfully searched and arrested hundreds of persons on false or otherwise improper narcotics charges, virtually all of whom were Black or Latinx. In the monitoring period that followed settlement of this lawsuit, multiple reviews of police reports showed that a large number of stops, detentions, and frisks conducted by the PPD violated the Fourth Amendment and that there was a large racial disparity in the stops and frisks that could not be explained by factors other than racial bias. The data compiled by the City continued to show a severe racially disparate impact on Black and Latinx individuals through 2005, when monitoring of the 1996 Settlement Agreement terminated.

58.      In 2010, the City was again sued in a class action lawsuit alleging that the PPD illegally stopped and searched thousands of Black and Latinx men and youth solely because of their race in violation of the Fourth and Fourteenth Amendments to the United States Constitution. *Bailey v. City of Philadelphia,* 2:10-cv-05952 (E.D. Pa.). Monitoring by plaintiffs' counsel

---

[11] John L. Puckett, *MOVE on Osage Avenue,* W. Phila. Collaborative. Hist., https://collaborativehistory.gse.upenn.edu/stories/move-osage-avenue (last visited July 13, 2020).

[12] *Philadelphia & MOVE: Home*, Community C. of Phila. Libr., http://libguides.ccp.edu/move (last visited July 13, 2020).

following the settlement of this lawsuit is ongoing. Reports of the parties show: (1) large racial disparities in stops and frisks between white residents and Black or Latinx residents of Philadelphia, with Black people being stopped at higher rates, and where these disparities are not explained by non-racial factors; and (2) Black suspects are stopped and frisked in violation of the Fourth Amendment at far higher rates than white suspects: Black people are over 50% more likely to be stopped without reasonable suspicion than white people and Black people are 40% more likely to be frisked without reasonable suspicion than white people.[13]

59.     There is also evidence that people in predominantly Black areas are treated differently by PPD. In a recent analysis of PPD's own data, Dr. Lance Hannon, Professor of Sociology and Criminology at Villanova University, reviewed more than 350,000 pedestrian stops with over 45,000 pedestrian frisks for 2014–2015 and found that PPD officers were more likely to stop and frisk residents of predominantly Black areas versus non-Black areas.[14]

60.     A review of vehicular search data conducted by the Defender Association of Philadelphia similarly suggests that the racial composition of a neighborhood is a predictor for how PPD officers will treat drivers in that area, with PPD officers more likely to conduct a stop when a driver is in a district that has a higher percentage of Black residents.[15]

61.     Data also suggests that PPD engage in discriminatory policing in the predominantly Black 52nd Street Community. In June 2020, the City's statistical expert in the *Bailey* litigation

---

[13] Plaintiffs' Tenth Report to Court on Stop and Frisk Practices: Fourteenth Amendment Issues at 2 , *Bailey v. City of Philadelphia*, No. 2:10-cv-05952 (E.D. Pa, Apr. 24, 2020), ECF No. 106 (hereinafter "*Bailey Race Report*").This report analyzes data from second half of 2019.

[14] Lance Hannon, *An Exploratory Multilevel Analysis of Pedestrian Frisks in Philadelphia*, 10 Sage J. 87 (2020), https://journals.sagepub.com/doi/abs/10.1177/2153368717730106.

[15] Brief for *Amici Curiae* Defender Association of Philadelphia and The American Civil Liberties Union of Pennsylvania on Behalf of Appellee, Timothy Barr at 23-25, *Pennsylvania v. Barr*, No. 2347 (Pa. Super. Ct., Mar. 2, 2020).

acknowledged that "PSA's [Police Service Areas] with larger African American residential populations experienced increasingly high stop rates per 100 residents" and that in PSA 181 and 182, which encompass the Cobbs Creek and 52nd Street Community, the "annual numbers of stops per 100 residents are unusually high."[16]

## V. Racial Stereotyping About Black Communities as Inherently Dangerous and Violent Among PPD Officers

62.     Research shows that police officers are more likely to falsely perceive predominantly Black communities as inherently dangerous, threatening, and violent due to stereotyping and racial bias.[17]

63.     A survey of social media posts collected by the Plain View Project shed light on the pervasiveness of stereotypical bias within the PPD, revealing a wide swath of racist remarks by officers, including one that likened a Black citizen to an animal and suggested that another individual be hanged.[18]

64.     These racist beliefs and biases do not stop at individual rank-and-file officers but extend to leadership. In 2017, several Black officers publicly complained about narcotics supervisors who they alleged referred to Black civilians as "scum" and to Black civilian slayings

---

[16] Response to Plaintiffs' Tenth Report to Court and Monitor on Stop and Frisk Practices: Fourteenth Amendment Issues at 2, 6, *Bailey* No. 2:10-cv-05952 (E.D. Pa, June 17, 2020), ECF No. 112-1.

[17] *See, e.g.,* L. Song Richardson, *Cognitive Bias, Police Character and the Fourth Amendment*, 44 ARIZ. ST. L.J. 267, 280 (2012) ("The problem with decisions allowing blanket consideration of race and location is that they exacerbate the influence of psychological biases on police judgments of criminality by strengthening the association between race and crime."); Jennifer L. Eberhardt et al., *Seeing Black: Race, Crime, and Visual Processin*g, 87 J. Personality & Soc. Psychol. 876 (2004), http://web.stanford.edu/~eberhard/downloads/2004-SeeingBlackRaceCrimeandVisualProcessing.pdf.

[18] Minyvonne Burke, *13 Philadelphia police officers who made racist, offensive Facebook posts to be fired,* NBC NEWS (July 18, 2019), https://www.nbcnews.com/news/us-news/13-philadelphia-police-officers-who-made-racist-offensive-facebook-posts-n1031341.

as "thinning the herd."[19] That same year, Philadelphia police union president, John McNesby, called Black Lives Matter a "pack of rabid animals" and refused to condemn white supremacy in PPD ranks, defending an officer who openly displayed a tattoo of a Nazi symbol.[20]

65.     These stereotypical and racist beliefs lead to excessive surveillance, stops, frisks, seizures, and force against individuals in predominantly Black communities, including *because* they are located in a predominantly Black community.[21]

## VI.     PPD's Use of Force and Military Style Weapons Against Plaintiffs in the 52nd Street Community on May 31st

66.     On May 31, 2020, in actions consistent with its history of targeting Black communities for discriminatory policing and unreasonable use of force, the PPD unleashed military style force in the 52nd Street Community without justification.

67.     In response to reports of a dangerous situation and "looting" of commercial establishments, Mayor Kenney authorized the use of "non-lethal munitions" in West Philadelphia.[22] He did so without acting to ensure that police would not use such force in an aggressive and unlawful manner. Throughout the day, police officers outfitted in full body armor,

---

[19] Mensah M. Dean, *Black Philly narcotics cops slam white supervisors*, PHILA. INQUIRER (Sept. 6, 2017), https://www.inquirer.com/philly/news/pennsylvania/philadelphia/complaint-narcotics-unit-rife-with-racism-corruption-20170906.html.

[20] Sebastian Murdock, Philly Police Union President Calls Black Lives Matter Activists 'A Pack of Rabid Animals', HUFFPOST: BLACK VOICES, https://www.huffpost.com/entry/philly-police-union-president-calls-black-lives-matter-activists-a-pack-of-rabid-animals_n_59aacc02e4b0dfaafcf0bc55?guccounter=1 (last updated Sept. 2017).

[21] *See, e.g.*, Devon W. Carbado & Patrick Rock, *What Exposes African Americans to Police Violence?* 51 Harv. C.R.-C.L. L. Rev. 161, 168 (2016), https://harvardcrcl.org/wp-content/uploads/sites/10/2009/06/HLC104_crop.pdf (explaining how perceptions of Black people as violent and dangerous leads to over policing of Black people and reinforces this false perception).

[22] *See* Mayor Jim Kenney (@PhillyMayor), TWITTER (June 25, 2020, 3:55 PM) https://twitter.com/PhillyMayor/status/1276242682453639168.

helmets, and face shields entered the predominantly Black 52nd and Market Street area of the City and repeatedly attacked protesters, residents and bystanders without provocation, using chemical irritants, such as tear gas, pepper spray, and other munitions, such as rubber bullets.

68.     Notwithstanding the claim by PPD that force was used only to control looting, PPD officers did not limit the attack to the 52nd Street commercial corridor, but used military style armored vehicles and other means to indiscriminately deploy chemical and other assaultive munitions in residential areas within the 52nd Street Community where there were peaceful protesters, street medics, who are volunteers trained to provide first aid at demonstrations, and residents of the 52nd Street Community who were, among other things, merely standing on their front porches.

69.     PPD officers used racial slurs, including "nigger" and "monkeys," while using pepper spray and rubber bullets against non-violent protesters in the area.

70.     Later in the evening of May 31st, members of Philly for REAL Justice who lived in the community, as well as other community members, gathered to protest police violence that had just occurred in the 52nd Street Community. At around 8 PM that evening, approximately 50 people gathered at 52nd and Arch streets. While there, they spoke out about the police violence that had occurred that day against their community and the larger issues of brutality across the United States, using a speaker to share their views and play music. Police were still patrolling the area with armored vehicles.

71.     Even as the crowd of people had dwindled to approximately15-20 people, at around 10 PM that night, a large group of police officers again attacked the demonstrators and bystanders with pepper spray, rubber bullets, and tear gas. Some community members were arrested and then

released in the early morning the following day, after being taken to precincts in other parts of the city.

72.     Over the course of the day, the PPD's actions turned the 52nd Street Community into something resembling a "war zone":

*a.*     Officers indiscriminately shot tear gas and pepper spray from handheld devices without warning.

*b.*     Elderly people using walkers tried to flee clouds of tear gas.

*c.*     Young children hid under cardboard boxes to try and avoid injury from PPD's actions.

*d.*     Tear gas canisters landed on residents' porches and in their backyards, forcing families to flee indoors.

*e.*     Even indoors, the tear gas reached residents, causing respiratory distress.

*f.*     The PPD's use of excessive and unwarranted force caused serious injuries, including Plaintiffs' injuries, that required medical attention and the intervention of the fire department and EMT personnel who took injured persons to hospitals on stretchers.

*g.*     Community members and volunteer medics provided makeshift treatment to injured people and were themselves attacked by police who shot medics with rubber bullets, destroyed the medic station, and took their supplies.

73.     At no time did Plaintiffs engage in any action that warranted the PPD's use of these dangerous munitions against them by the terms of the PPD's guidelines for use of these munitions or under Constitutional limitations on use of unreasonable force.

74.     Despite being frequently termed "non-lethal," tear gas, pepper spray, and "less-lethal" projectiles are powerful, dangerous and, on occasion, lethal:

*a.*     Tear gas, or "CS gas," is a synthetic compound that causes irritation of mucous membranes, the skin, and the eyes, resulting in tearing, extreme pain, coughing, and difficulty breathing. Tear gas is usually disbursed through the firing of canisters, which explode and release the compound in the air. When used in close spaces or in large amounts, these effects can be enhanced, or even fatal. Under the Geneva Convention, the use of tear gas is banned in warfare.

*b.*     Pepper spray, also known as oleoresin capsicum or OC spray, is different from tear gas in that it is not synthetic. It causes extreme pain in the eyes, often described as a "bubbling" or "boiling" sensation. This eye damage can sometimes be permanent and even lead to blindness. Pepper spray is disbursed through aerosolizing the compound in liquid streams or mists. It is also sometimes fired in a projectile known as a "pepper ball." Pepper spray is particularly dangerous for people with preexisting breathing deficits, such as asthma.

*c.*     "Less-than-lethal" projectiles, broadly defined, are munitions made from many different substances, including rubber-coated steel bullets, wood, or wax, that are fired from specially designed weapons. Although designed not to cause fatalities, such projectiles are known to cause severely incapacitating—and often permanent—injuries, including the loss of eyes, broken bones, and damaged internal organs.

75.     Individuals exposed to tear gas can continue to experience significant adverse health consequences for up to at least one month after exposure.[23] CDC guidance explains that long-lasting exposure to tear gas, especially in close settings, can lead to severe effects, including: blindness, glaucoma (a serious eye condition that can lead to blindness), immediate death due to severe chemical burns to the throat and lungs, and respiratory failure possibly resulting in death.[24]

76.     Given the dangerous nature of tear gas, pepper spray and rubber bullets and other projectiles, PPD's Directives recognize that their deployment must be circumscribed. As recognized by PPD Directives, there can be no justification to use pepper spray "[f]or the dispersal of non-violent persons, disorderly crowds, or in situations where people are peacefully exercising their Constitutional Rights of Free Speech or Assembly."[25] Pepper spray cannot therefore be used as a prophylactic measure pursuant to PPD Directives and can only be used in the most extreme circumstances.

77.     The use of tear gas during the ongoing COVID-19 pandemic creates additional risks for those exposed. COVID-19 is spread through respiratory droplets, which are spread by coughing, sneezing, and talking.[26] In addition to burning of the eyes, nose, and mouth, exposure

---

[23] Y.G. Karagama, J.R. Newton & C.J.R. Newbegin, *Short-term and long-term physical effects of exposure to CS spray*, 96 J. R. SOC. MED. 172 (2003), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC539444/.

[24] *Facts About Riot Control Agents Interim document*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://emergency.cdc.gov/agent/riotcontrol/factsheet.asp (last updated Apr. 4, 2018).

[25] Philadelphia Police Department Directive 10.3, Use of Less Lethal Force: The Electronic Control Weapon (ECW) (issued Sept. 18, 2015), https://www.phillypolice.com/assets/directives/D10.3-UseOfLessLethalForce.pdf.

[26] *Frequently Asked Questions*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/faq.html#Spread (updated July 3, 2020) (see section on "Spread"; expand the tab under "How does the virus spread?").

to tear gas can cause increased nasal secretions, immediate coughing, and sneezing,[27] and thereby increase risk of the spread of COVID-19, which is already disproportionately harming Black communities compared to predominantly white communities.[28]

78.     Public health guidance advises that wearing a respiratory mask is one of the most important ways of preventing the spread of COVID-19. Because tear gas creates respiratory problems, however, many individuals exposed to tear gas cannot keep their masks on. When large groups of people congregate, remove their masks, and cough or sneeze, the risk of becoming infected with COVID-19 skyrockets.

79.     On May 31st, the use of tear gas and pepper spray prompted many individuals, including Plaintiffs, to remove their protective facial coverings, creating an additional level of harm during the current COVID-19 pandemic.

80.     The below twenty Plaintiffs in this matter were subjected to PPD's unlawful conduct in the 52nd Street Community on May 31st.

### a.     *Bedjy Jeanty*

81.     In the early afternoon of May 31st, Mr. Jeanty was participating in a peaceful protest on 51st Street. He was protesting for his three children, because he knows that police brutality affects his children, who are Black people, and he fears for their safety every day. Mr. Jeanty heard police officers repeatedly refer to the Black people at the protest as "niggers" and "monkeys" while telling them to go home. Mr. Jeanty raised his fist in the air to represent Black power, and police

---

[27] Karagama et al., *supra* note 23.

[28] In Philadelphia, Black people make up 44 percent of the city's population, but approximately fifty percent of the 23,951 positive cases of COVID-19 and over half of the 1,433 people who have died from the virus as of June 10, 2020. *See* Queen Muse, *Philly's Black Community Has Been Disproportionately Affected By COVID-19. Why Is the City Just Now Doing Something About It*, PHILA. MAG. (June 11, 2020), https://www.phillymag.com/healthcare-news/2020/06/11/black-community-covid-19-philadelphia/.

fired rubber bullets at Mr. Jeanty's arm, hitting his shoulder. The police began deploying pepper spray, tear gas, and rubber bullets at the protesters. Although Mr. Jeanty was wearing a mask, his mask fell off after he was stuck in a cloud of tear gas. Police officers repeatedly sprayed Mr. Jeanty with pepper spray. His shoulder was dislocated when it was hit by the rubber bullet. He was treated at the hospital that day, and, for about two weeks, Mr. Jeanty could not lift his shoulder. He still feels sudden pain in his shoulder periodically.

### b.   Ketty Richard

82.   In the early evening of May 31st, Ms. Richard joined plaintiff, Mr. Jeanty, on the intersection of 52nd and Market Streets to protest police brutality. She decided to attend the protests, even amidst the COVID-19 pandemic, because she is raising two Black sons and is concerned for their safety. As she listened to Mr. Jeanty give a speech, suddenly, and without warning, officers began using force against the peaceful protesters by pushing, shooting rubber bullets, discharging pepper spray and tear gas, and using their batons. During the commotion, she heard officers use the word "nigger" and "boy" on several occasions. Ms. Richard suffered lingering burning in her eyes, face, and throat as a result of the tear gas.

### c.   Joseph Moyer

83.   On the afternoon of May 31st, Mr. Moyer returned to his West Philadelphia home after attending a peaceful protest against police brutality. Upon returning home, he learned of ongoing demonstrations near his house at 52nd and Market Streets. Mr. Moyer decided to attend the demonstrations in solidarity with his neighbors and the Black Lives Matter movement. Shortly after arriving at the demonstrations, he witnessed law enforcement indiscriminately using pepper spray and tear gas on a crowd. Due to the chemical irritants in the air, his eyes and throat began to burn. Mr. Moyer observed a man staggering through the street, blinded by the tear gas and pepper

20

spray. Mr. Moyer tried to get the man to safety and, in the process, was shot in the back by a less-than-lethal projectile. As Mr. Moyer attempted to return to the safety of his house, he witnessed law enforcement officers shooting tear gas canisters indiscriminately at civilians, including families, and residences near 52nd and Spruce Streets. By the time he returned home, he was in tremendous pain from the tear gas, pepper spray, and less-than-lethal projectile. The wound from the projectile remained for several weeks.

        *d.*     ***Ryan Bing***

84.      At approximately 4:30 PM on May 31st, Mr. Bing went to join the protests taking place in the 52nd Street Community. He traveled by bicycle. Due to concerns about contracting COVID-19, he wore a mask. When he arrived at 52nd and Chestnut Streets at approximately 5:15 PM, he noticed a group of protesters and bystanders and a police barricade. Mr. Bing joined this group of protesters and was peacefully protesting and observing the police. Then, at approximately 5:30 PM, he witnessed at least two officers in riot gear appear from the north on 52nd Street, move to the northwest corner of the intersection, and, suddenly and without warning or order to disperse, throw at least two tear gas canisters into the crowd. Mr. Bing called out "Gas, gas, gas," to alert others, as everyone in the area except for the police turned and ran west on Chestnut Street. As Mr. Bing turned to pick up his bike and leave the area, he felt a less-lethal round hit him in his ribs. He quickly moved west on Chestnut Street with the rest of the group, and when he got to the end of that block, approaching 53rd Street, Mr. Bing saw tear gas deployed by at least two officers. Mr. Bing continued west with the crowd fleeing the area. Mr. Bing suffered stinging in his eyes and throat for several minutes. He sustained bruising and discomfort for approximately two weeks on the side of his chest where he was struck with the projectile. In addition, Mr. Bing was and remains concerned that he may have been exposed to COVID-19 as a

result of police actions, since after the police deployed tear gas, the crowd packed closely together when escaping the tear gas.

### e. *Shahidah Mubarak-Hadi*

85.     On May 31st, at around 6 PM, Ms. Mubarak-Hadi was at home on a residential block of 52nd Street with her three and six-year-old sons. Some of the windows of the home were open. Suddenly, her youngest son began crying, and her older son said to her that there was something in his eyes. Ms. Mubarak-Hadi noticed that there was tear gas coming through the windows. An asthmatic, she had trouble breathing. Days later, she still had a persistent burning sensation in her chest, nostrils, and throat. She and her sons are deeply traumatized by the harm they experienced from police without warning and while they sat in the safety of their own home.

### f. *Marie Johnson*

86.     On May 31st, at approximately 2:30 PM, Ms. Johnson was in her home on the 5200 block of Chancellor Street when she heard a loud noise. She was unsure what was happening until she spoke to her neighbor by phone, who told her to go outside because there was a large commotion on their residential street. She watched from her porch as an armored police tank came down 52nd Street heading southbound, and then down 53rd Street heading northbound. She saw police indiscriminately shooting rubber bullets at residents on her street who tried to run away, including a friend of Ms. Johnson who was shot in the forehead while trying to escape. Later, at approximately 6 PM, she saw something drop from a helicopter that had been continuously circling the area. A large cloud of smoke began expanding from the middle of her residential block. Ms. Johnson's eyes started burning and she ran into the house to put water on her face. Because her windows were open, her home was impacted by the gas fumes. Her eyes, face and throat continued to burn for approximately one hour.

g.     *Amelia Carter*

87.     On May 31st, at approximately 3:30 PM in the afternoon, Ms. Carter returned to her home on Chancellor Street and was informed by neighbors that police were present en masse and using tear gas in the community. Ms. Carter saw an elderly woman who had been hit in the head by a rubber bullet sitting on a neighbor's front steps. Soon after, she witnessed officers move south on 52nd Street towards Chancellor Street firing tear gas and rubber bullets at people gathered in the area. A resident who had been shot in the leg by a rubber bullet was receiving help with walking while others had difficulty breathing due to the tear gas.

88.     Later in the afternoon, around 4:45 PM, Ms. Carter was walking south on 52nd Street and saw police officers once again fire tear gas and rubber bullets at people gathered on the 52nd Street Corridor. A tear gas canister landed right in front of Ms. Carter. As the gas surrounded her, she could not breathe or see. A street medic helped flush her eyes with water. Ms. Carter was worried about COVID-19 exposure because, as she was coughing, people trying to help, including the street medic, came close to assist her. Upon reaching Chancellor Street, gas canisters were shot down her residential street and she was hit with tear gas again. When Ms. Carter returned to her home, it was full of tear gas, forcing her to go back outside. The PPD armored vehicles continued moving south on 52nd Street, firing tear gas onto residential streets. Ms. Carter could hear residents yelling at the police that "kids live here" and to "go home."

89.     At around 6 PM, Ms. Carter saw police return to Chestnut Street, where they released more tear gas at residents on Walnut Street who presented no threat. Throughout the day, Ms. Carter never heard or saw the police attempt to communicate with residents or warn them before using tear gas or rubber bullets.

### h.   *Elaine Holton*

90.     On May 31st, Ms. Holton heard a loud bang while she was at home on the 5200 block of Chancellor Street. Later in the afternoon, while standing on Chancellor Street, Ms. Holton saw an armored police vehicle shooting tear gas onto the streets. She saw an elderly woman stuck in the tear gas and escorted her to a neighbor's front steps. The police continued shooting tear gas canisters, several of which fell on an empty lot across the street from Ms. Holton. She experienced burning in her eyes and throat and difficulty breathing from the teargas.

91.     Later that evening, at 52nd and Chestnut Streets, dozens of police in riot gear repeatedly fired rubber bullets into the crowd, forcing Ms. Holton to hide behind a bus stop. The police officers never communicated with neighborhood residents or gave an order to disperse. Ms. Holton heard residents repeatedly ask the police to leave the neighborhood.

### i.   *Christina Garcés*

92.     On May 31st, Ms. Garcés learned about the heavy police presence on 52nd Street from social media. She is a medical student at Temple University and went to 52nd Street in order to provide aid to people in need, wearing a shirt with a red cross on it that said "First Aid," and carrying a first aid kit. When she arrived at approximately 3 PM near 52nd and Market Streets, she saw people running and could hear the distinct noise of rubber bullets and tear gas being fired. Ms. Garcés assisted numerous people with burns, cuts, and active bleeding from being hit with tear gas cannisters or rubber bullets, including two people bleeding severely who she counseled to go to an emergency room. She also saw two children with pepper spray injuries. One child could not open his eye and had a laceration on his forehead. Ms. Garcés witnessed the targeting of clearly marked medics. A group of officers in body armor tear-gassed an area where a medic station had been established and destroy supplies. Ms. Garcés repeatedly saw police officers throw tear gas canisters

in multiple directions on side streets. She witnessed police officers traveling in tanks as people scattered and saw officers shoot rubber bullets at any persons remaining in the tanks' path. She saw this pattern occur multiple times.

93.     Later on, Ms. Garcés made her way to a residential street and stood in a doorway to seek shelter. Officers shot tear gas down the side street and a canister landed in front of her, trapping her in the doorway. She tripped, fell to the ground, and had difficulty breathing. She was unable to see and felt like she was going to lose consciousness, but residents on the block picked Ms. Garcés up, brought her into their home, and flushed away the tear gas with water. When she recovered and returned to her car after dark, Ms. Garcés noticed people looting the liquor store in the area of 49th Street and Baltimore Avenue, a more racially diverse part of West Philadelphia. The people taking property from the store were all white. She saw no police presence near the liquor store, even though the police presence continued near 52nd Street where she had seen no looting.

### j.     Marquis Ransom

94.     On May 31st, at approximately 3 PM, Mr. Ransom learned that there was a large police presence on the main 52nd Street Corridor from approximately Locust to Chestnut Streets. Out of concern, he and Plaintiff Johana Rahman went to try to make sure that no one was injured. When they arrived, he saw police present en masse, spraying pepper spray and shooting rubber bullets. He saw Plaintiff Bedjy Jeanty was pepper-sprayed and saw that his shoulder was dislocated. He saw officers indiscriminately spraying tear gas and pepper spray from handheld devices without warning and he saw another man injured after he was hit with a rubber bullet. Outside of Big G's Chicken Shack, at 51st and Locust streets, there was a makeshift medic station where Mr. Ransom was directing people. Later in the afternoon, officers began to surround and block people on 52nd Street between Walnut and Chestnut. Mr. Ransom could not escape as

officers sprayed pepper spray at him and others. He could not see anything. Mr. Ransom was forced to take off the mask that he had been wearing to protect himself from exposure to COVID-19. His eyes were burning and his throat was irritated for hours.

### k.   Cora Isom

95.     On May 31st, in the early afternoon, Ms. Isom was in the area of 52nd and Walnut Streets when she saw armored police vehicles arrive and officers in full body armor begin firing tear gas canisters in all directions. Her eyes began tearing, and she could not see. Ms. Isom had on a face covering to protect herself from COVID-19, which she had to loosen because it was saturated with tear gas. Ms. Isom decided to take cover in the home of her neighbor, Plaintiff Catherine Heite. On the way, on the residential block where Ms. Heite lives, she saw neighbors including children, coughing and having trouble breathing—many of whom were sitting in their home or on their porches. Ms. Isom's throat hurt for hours. The terror of that day continues to haunt her.

### l.   Catherine Heite

96.     On May 31st, in the early afternoon Ms. Heite was in her home when she saw a commotion and learned that police were outside preparing to use tear gas near her home. Out of concern for her neighbors, Ms. Heite, who has received some training to provide basic first aid and other care, put on a hard hat and carried some buckets of water to diffuse tear gas canisters. When she arrived at the intersection of 52nd and Chestnut, she saw fully armored police arrive en masse and immediately begin shooting at people on 52nd Street with rubber bullets. Ms. Heite was hit in the helmet with a rubber bullet at less than half a block distance and in her arm, leaving a large bruise. The police continued south down 52nd Street shooting rubber bullets and tear gas canisters down side streets and at residents indiscriminately. Ms. Heite saw three young Black girls hide

under a cardboard box as munitions landed on the porch roof over their heads on the 5200 block of Irving Street. An elderly Black man on that same block was trying to hurry inside from where he had been barbequing using his walker when the street was gassed. She helped him to get to safety. Eventually, she went back to her home for cover and to help her neighbors who needed medical attention. To this day, when Ms. Heite and her neighbors talk about what happened on May 31st, they are terrified and she has seen her neighbors begin shaking when talking about the traumatic event.

### m.    Emily Neil

97.    On May 31st, Ms. Neil arrived at 52nd Street around 5:00 PM with a camera to document the events occurring that day in West Philadelphia. Ms. Neil is a freelance reporter. At 52nd and Chestnut Streets she observed a crowd of people and a large police presence. Police fired teargas indiscriminately from their armored vehicle. Ms. Neil recorded three police officers making an arrest. Another man standing nearby was also recording the police and told them that he was recording. The police officers in SWAT uniforms opened fire with rubber bullets on Ms. Neil and the other man who was recording. Ms. Neil was hit on her back, and, as she dove towards the ground to protect herself, she was shot again in the side of the head. The man who had been recording and another bystander came to her aid and applied pressure to her head wound. At the intersection of 52nd Street and Sansom Street, a doctor on the scene examined her wounds and kept her sitting down until an ambulance arrived. Ms. Neil was transported to Jefferson University Hospital where she received eight stitches on the forehead. For several days following May 31st, she had a headache and difficulty reading and writing. Ms. Neil believes she was targeted by the police because she was documenting their excessive use of force that day.

### n.     Judith Palmer

98.     On the afternoon of May 31st, Ms. Palmer learned of a large police presence on 52nd Street. Having seen the extreme use of force by police at protests she attended earlier that weekend, she decided to be a witness in case the situation on 52nd Street escalated. She left her home at around 4:45 PM, and shortly after, she saw a large armored tank travel down 52nd Street toward Locust Street. As she was recording, two officers approached her. One officer looked at her recording and then, without warning, shot her with a rubber bullet. No one in the area was engaged in dangerous or disruptive activities. Afraid that she would be shot again if she continued to document police activity, Ms. Palmer returned to her home. The rubber bullet left a lump that lasted for several weeks, and she still has bruising from the injury that remains to this day.

### o.     Anthony James

99.     On May 31st, at approximately 6:30 PM, while he was riding his bike, Mr. James saw a caravan of police vehicles present at around 51st and Market Streets. Armored police tanks were arriving and riding through residential streets in the area. Residents were standing outside watching. Approximately four officers began deploying canisters of tear gas. Mr. James thought it looked like a war scene. He could not figure out why there was this level of police presence or why they were displaying military style weapons. He began to photograph what he saw. While he was taking photographs, approximately three police officers approached and sprayed Mr. James and others nearby him with pepper spray. His eyes were burning. Disturbed by what he saw, he eventually decided to leave the area and go home.

### p.     Sahar Sadeghi

100.    On May 31st, at approximately 11:50 AM, Ms. Sadeghi was driving home when she saw a large police presence around 52nd Street and Market Street. She got out of her car to see

what was going on, but a police officer told her to get back in her car. She drove back to her home on the 5300 block of Chestnut Street. Later, she walked toward 52nd Street with two friends and saw approximately ten to twelve people standing on the corner with her and a large group of police officers nearby. At approximately 12:15 PM, an armored vehicle drove towards the group with three or four police officers wearing all black walking alongside it. Unprovoked, the officers on foot pepper sprayed Ms. Sadeghi, who was filming, and the people standing near her. She was sprayed on the hand, ear, and down her back, causing her to fall to the ground. She could barely see, but she made her way home and called a friend for help. Later that afternoon, Ms. Sadeghi made a mixture of water and baking soda and sat on her porch to help those being tear gassed. She helped three or four people rinse their eyes and could see more people running away from the tear gas. The events of that day made it difficult for Ms. Sadeghi to sleep or feel safe in her own home for days after.

### q.    *Sergio Cea*

101.    On May 31st, between 4 PM and 5 PM, Mr. Cea was riding his bike in the area of the 52nd Street Corridor. Mr. Cea observed protesters and bystanders gathered on the street until, without warning, police officers began shooting rubber bullets and tear gas indiscriminately at anyone in sight. People began running. Mr. Cea traveled to a residential block near 52nd and Delancey Streets to escape the commercial corridor, and he saw police shoot a tear gas canister down the block. Mr. Cea had not seen protesters or people present on the block, except for residents. He struggled to see due to the tear gas, and fell off of his bike several times. Mr. Cea made his way towards Malcolm X Park, but officers were firing canisters of tear gas in the park, while terrified residents, who had been walking their dogs or engaged in other recreation, were

shouting and running from the park. Mr. Cea fled the area. His eyes continued to sting for hours afterward and his lungs burned.

### r.    *Johana Rahman*

102.    On May 31st, at approximately 3 PM, Ms. Rahman saw a large group of police officers on 52nd Street from approximately Locust to Chestnut Streets. People were beginning to gather outside, asking what was going on. Ms. Rahman went to the house of Plaintiff Mr. Ransom, and because she was concerned about the large police presence, she decided to go with Mr. Ransom to try to help people if the situation escalated. Ms. Rahman is trained as a street medic. She and Mr. Ransom directed people to a makeshift medic station outside of Big G's Chicken Shack. At around 5 PM, police officers arrived in a van and started chasing people on the street, spraying pepper spray. All around her, people were running down 52nd Street trying to escape. Police began surrounding and blocking people on 52nd Street between Chestnut and Walnut streets with personnel and vans while shooting tear gas. Ms. Rahman has asthma, and she began hyperventilating from the tear gas. Ms. Rahman also saw a group of officers in full body armor destroy the makeshift medic station.

103.    Later that evening, Ms. Rahman joined other members of the community and members of Philly for REAL Justice outside to gather together at 52nd and Arch Street and to speak out against the ongoing police presence and violence in the 52nd Street Community. Police officers, with shields and helmets, watched for some time, then approached and confiscated the food that some of them had brought with them, and then backed away again. A few minutes later, without warning, police officers ran toward the group and surrounded one of the group's leaders, Anthony Smith. At around the same time, officers began spraying pepper spray and rubber bullets. Ms. Rahman began running, but she was pepper sprayed in the back of the neck. Later, Ms. Rahman

tried to clean herself, but the pepper spray came out from her hair, causing her to have another respiratory attack. Ms. Rahman's face and hands continued to burn for hours, and her throat continued to feel irritated for weeks.

### s.   *Isa Richardson*

104.   On May 31st, when Mr. Richardson learned that there was a large police presence in his community, he decided to go help his neighbors who he feared would be in danger if the situation escalated. Mr. Richardson volunteers as an organizer with Philly for REAL Justice. He is also trained as a street medic. At approximately noon, he set up his medical supplies around 52nd and Arch Street. He witnessed officers in armored trucks driving up and down residential streets and, without warning, firing tear gas canisters at anyone who happened to be in the area. He observed people removing their COVID-19 masks and rubbing their eyes because of the impact of the tear gas. He helped provide eye washes to bystanders, including to an elderly Black couple who were struggling to see so they could walk home. He saw an officer spray one man with pepper spray in close proximity. Then an officer began shooting rubber bullets at Mr. Richardson and people around him. A significant police presence remained in the area with military style weapons for hours.

105.   Later that evening, Mr. Richardson joined other members of the community, including several members of Philly for REAL Justice, gathered outside at 52nd and Arch streets as described above. PPD officers, dressed in full body armor with helmets and face shields, arrived and watched while the group of approximately 20 people listened to music and spoke about the unfair treatment their community was receiving. He saw a group of police, in full body armor, approach and take their snacks. Mr. Richardson saw Plaintiff Anthony Smith surrounded by several police officers and arrested. While this was occurring, without warning, a large group of

armored police officers once again began shooting rubber bullets at Mr. Richardson and the other people who were on the street. Mr. Richardson was hit in the chest with a rubber bullet. Mr. Richardson still has chest pains, and he had bruises for weeks from the impact of the rubber bullet.

       *t.*      *Anthony Smith*

106.    On May 31st, Mr. Smith left his home to get food and water and observed a large police presence on 52nd Street along the business corridor. Shortly after his arrival, he saw police officers firing tear gas and rubber bullets and tanks driving through narrow residential streets. Mr. Smith helped some other people wash tear gas from their eyes. He also saw a younger white woman get shot with a projectile in the head. As she was carried away on a stretcher, Mr. Smith saw that the woman's head was covered in blood. Fearing for his safety, Mr. Smith went home.

107.    Later that night, at around 8:30 PM, Mr. Smith learned that police were present at a gathering near 52nd and Arch Street, and he went back outside to see if anyone needed help. He observed a group of about 20 people, including residents, with snacks and water, playing music and speaking about the police violence that had occurred that day. He then witnessed an outsized police response of the type he would expect to see at a far larger protest, including police in fully armored suits and armored law enforcement vehicles.

108.    Without any verbal warnings, a large group of police put up their shields and started moving in toward the people gathered. Armored police officers seized their water and snacks. At the same time, Mr. Smith observed an individual who was listening to music and not paying attention, walking towards the police officers. Mr. Smith told the man to "pay attention" out of concern for the individual's safety. Suddenly, several police officers pushed the man with a shield, and Mr. Smith asked the officers to leave him alone.

109.    Several officers then grabbed Mr. Smith by the shirt, and although Mr. Smith was not resisting, threw him to the ground. Approximately 15 officers circled around him. Mr. Smith feared that like Mr. Floyd, and other Black people on whose behalf he had protested, he would be killed by police. He heard a bang and thought maybe he had been shot. Mr. Smith later realized the shot he heard was the less-than-lethal projectile that hit his friend Mr. Richardson.

110.    Several officers arrested Mr. Smith and put him into a truck. He heard the officers discussing what charges he should get. Mr. Smith was driven around for four hours, until they arrived at the 22nd District in North Philadelphia at around 3 AM. He was ultimately given a curfew violation charge and released within about 15 minutes at the precinct. Because public transportation was closed for the night, Mr. Smith walked for nearly 3 hours to get home. His family did not know where he was during the approximately eight hours after the police abducted him.

## VII.    The Unjustified and Excessive Use of Force on May 31st in the 52nd Street Community was Authorized by City Policymakers

111.    In a City Council budget hearing on June 10, 2020, City Managing Director Brian Abernathy stated that, on May 31, 2020, City policymakers broadly authorized police to use tear gas in West Philadelphia. According to Abernathy's testimony, this decision was made by the City's unified command group, which, in addition to Mayor Kenney, Commissioner Outlaw, and Abernathy, included the heads of multiple City agencies.[29]

---

[29] Laura McCrystal, *Mayor Jim Kenney approved tear gas use at Philly protests, officials say as City Council questions police response*, PHILA. INQUIRER (Jun. 10, 2020), https://www.inquirer.com/news/tear-gas-protests-philadelphia-police-budget-20200610.html.

112.    During a press conference on June 1, 2020, Mayor Kenney stated that he had authorized the use of tear gas in West Philadelphia on May 31, 2020, in response to a dangerous situation including violence and looting.[30]

113.    In a Tweet on June 25, 2020, Mayor Kenney again stated that he approved the use of "non-lethal munitions" in West Philadelphia in response to violence and looting.[31]

## VIII.    The Unjustified and Excessive Use of Force on May 31st in the 52nd Street Community was Racially Discriminatory

114.    The Defendants' unjustified and excessive use of force on May 31st in the 52nd Street Community was motivated, at least in part, by the race of some of the Plaintiffs and the fact that the 52nd Street Community is a predominantly Black neighborhood.

115.    PPD officers used racial slurs such as "niggers" and "monkeys" when using pepper spray, tear gas and/or rubber bullets against protesters, bystanders, and residents.

116.    Despite the justification provided by Philadelphia officials that the violent tactics were appropriate responses to looting, the PPD chose not to use similar "less-than-lethal" munitions in other similarly-situated predominantly non-Black residential neighborhoods that experienced looting in the days surrounding May 31st.

    *a.*    In Center City Philadelphia, along the Chestnut and Walnut Streets commercial corridor west of Broad Street, there were widespread incidents of looting on May 30, 2020.[32] PPD did not use tear gas and other munitions there – either on the

---

[30]    Ellie    Rushing    (@EllieRushing),    Twitter    (June    25,    2020), https://twitter.com/i/broadcasts/1vOxwkwNazrxB.

[31]    *See* Mayor Jim Kenney (@PhillyMayor), TWITTER (June 25, 2020, 3:55 PM) https://twitter.com/PhillyMayor/status/1276242682453639168.

[32]    Ximena Conde et al., *Philly prepares to bring in National Guard as unrest spreads*, WHYY NEWS, PBS (May 31, 2020), https://whyy.org/articles/cleanup-underway-in-center-city-after-peaceful-protest-gave-way-to-fires-looting/.

commercial streets themselves or in the residential blocks surrounding that area. The residents of that area of Center City Philadelphia are predominantly non-Black.

**b.**     In the overlapping Philadelphia neighborhoods of Port Richmond, Kensington, and Fishtown, there were reports of widespread looting from May 31st into June 1st.[33] Yet PPD did not use tear gas and other munitions there – either on the commercial streets or in the residential blocks surrounding that area. The residents of Port Richmond, Kensington, and Fishtown are predominantly non-Black.

**c.**     In fact, while police terrorized residents in the 52nd Street Community, during the same weekend of protests, officers permitted a vigilante mob of approximately 100 men armed with baseball bats, clubs, and hammers to roam the streets even after the Citywide curfew near the PPD's 26th District headquarters in the predominantly white neighborhood of Fishtown.[34] Even while this mostly white vigilante group threatened and assaulted bystanders, using racist and homophobic slurs, PPD officers did not arrest them, but simply stood by. The PPD did not respond with tear gas or other military munitions.

**d.**     On June 13, 2020, and June 14, 2020, at Marconi Plaza in South Philadelphia, a group of a few hundred people, mostly white men, gathered and protested around a statue of Christopher Columbus, brandishing weapons, including rifles, baseball bats, and golf clubs. A smaller group of counter-protesters, largely women and

---

[33] Ashley Johnson, *'It's been like a war zone': Kensington neighbors come together after businesses struck by looters*, ABC NEWS, WPVI-TV PHILADELPHIA (June 4, 2020), https://6abc.com/philadelphia-news-kensington-looting-protests/6229428/.

[34] Anna Orso, Allison Steele, William Bender and Vinny Vella, *Philly police stood by as men with baseball bats 'protected' Fishtown. Some residents were assaulted and threatened*, https://www.inquirer.com/news/fishtown-george-floyd-protests-philadelphia-bats-hammers-20200602.html (last updated June 2, 2020).

people of color, were also present and gathered peacefully. Dozens of PPD units and officers were on the scene. At various points, members of the white group of protesters attacked the peaceful counter-protesters physically and verbally with racial slurs and threats. During the assault, PPD largely officers stood by and watched.[35]

117.    The City's reaction in the aftermath of the use of force against protesters in various parts of Philadelphia has also demonstrated racial bias. Facing criticism from reporting that the City had given broad authorization for the use of tear gas, Mayor Kenney and Commissioner Outlaw issued a statement announcing an independent investigation into police actions on the 676 Expressway.[36]

118.    While Mayor Kenney and Police and Commissioner Outlaw apologized for the "unjustifiable" use of force when officers teargassed more racially diverse protesters marching on the 676 Vine Street Expressway,[37] neither has apologized for the egregious violence against the predominantly Black 52nd Street Community. Although the Mayor expressed "regret" after video

---

[35] Samantha Melamed, *Protest observers say police allowed South Philly Columbus 'defenders' to assault them,* PHILA. INQUIRER (June 16, 2020), https://www.inquirer.com/news/columbus-statue-black-lives-matter-krasner-philadelphia-marconi-vigilantes-20200616.html.

[36] Press Release, Phila. Police Dep't, Off. of the Mayor, Mayor Kenney and Police Commissioner Danielle Outlaw Issue Statements on the Use of Tear Gas (June 1, 2020), https://www.phila.gov/2020-06-01-mayor-kenney-and-police-commissioner-danielle-outlaw-issue-statements-on-the-use-of-tear-gas/.

[37] Christoph Koettl, Nilo Tabrizy, Muyi Xiao, Natalie Reneau & Drew Jordan, *How the Philadelphia Police Tear-Gassed a Group of Trapped Protesters*, N.Y. TIMES (June 25, 2020), https://www.nytimes.com/video/us/100000007174941/philadelphia-tear-gas-george-floyd-protests.html.

footage of the 676 tear gassing surfaced, he maintained that the situation in which he gave consent to use tear gas in West Philadelphia was "a totally different situation" than the protests on 676.[38]

119.    In response to the Mayor's statement, Philadelphia Councilmember Jamie Gauthier, who represents the 52nd Street corridor, demanded that the Mayor explain why police fired tear gas canisters into the streets of West Philadelphia for hours stating that: "the conversation around tear gas and use of force by police continues to focus on 676, without a realization or recognition that these same tactics and more were used on a residential Black neighborhood." [39]

120.    To date, neither the PPD nor anyone in the Kenney administration has responded to Gauthier's statement.

121.    To date, no police officer has been disciplined by Mayor Kenney or Commissioner Outlaw or held responsible for the excessive use of force in the 52nd Street Community.

122.    The PPD's use of excessive force in the 52nd Street Community on May 31st is part of a pattern and practice of racially biased policing, described in paragraphs 46 through 54, that has long been known to the City through various lawsuits, investigations, reports, and consent decrees, and which the City has failed to rectify.

123.    When authorizing the use of tear gas and other munitions, Mayor Kenney, Commissioner Outlaw, and other City policymakers failed, with deliberate indifference, to account for the City's longstanding failure to train, supervise, and discipline its officers in connection with the aggressive use of force, and, in particular, the aggressive use of force in a predominantly Black

---

[38] *See* Mayor Jim Kenney (@PhillyMayor), TWITTER (June 25, 2020, 3:55 PM) https://twitter.com/PhillyMayor/status/1276242682453639168; Ellie Rushing (@EllieRushing), Twitter (June 25, 2020), https://twitter.com/i/broadcasts/1vOxwkwNazrxB.

[39] Aubrey Whelan, *West Philly calls for investigation of police use of tear gas after officials apologize for using it on I-676*, PHILA. INQUIRER (Jun. 28, 2020), https://www.inquirer.com/news/west-philadelphia-tear-gas-use-of-force-police-investigation-20200628.html.

area like the 52nd Street Community. In authorizing the use of this level of force, the City's policymakers disregarded the high risk that police would abuse this authorization and would use unlawful force against plaintiffs and others whose conduct was legal and could not constitutionally be met with tear gas and other munitions.

## FIRST CAUSE OF ACTION
### Fourth Amendment Excessive Force – 42 U.S.C. § 1983
### (All Plaintiffs v. All Defendants)

124.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs.

125.    Plaintiffs have a clearly established right under the Fourth and Fourteenth Amendments to be free from the unreasonable and excessive use of force.

126.    As a direct and proximate result of Defendant Officers John Does' conduct, Plaintiffs were subjected to excessive and unreasonable force and sustained physical injuries that, in some cases, required medical treatment and hospitalization, as well as emotional anguish. Defendant Officers indiscriminately subjected Plaintiffs, including residents with young children taking shelter in their own home, to pepper spray and tear gas without an adequate dispersal order or other warning. Defendant Officers further inflicted severe injuries by indiscriminately pepper-spraying a peaceful crowd, launching canisters of tear gas, and firing rubber bullets and other munitions.

127.    At all times, the conduct of defendants John Does 1-100 was in willful, reckless, and callous disregard of Plaintiffs' clearly established rights under federal and state law.

128.    Mayor Kenney and Commissioner Outlaw knew in advance and approved of, or were deliberately indifferent to, the PPD's use of force in West Philadelphia and against Plaintiffs, despite knowing the severe harm associated with the tear gas, pepper spray, and rubber bullets.

129.    The City has a long history of misconduct—including, but not limited to unwarranted stops, frisks, and seizures, excessive force and brutality in predominantly Black communities in the City, like the 52nd Street Community. Yet, despite this history, Mayor Kenney and Commissioner Outlaw did not take steps to prevent police from using excessive force against protesters and bystanders in the 52nd Street Community.

130.    All of the unconstitutional actions described above were the result of specific decisions and authorization made on the part of policymakers for the City, including Mayor Kenney who has publicly admitted, on at least two occasions, to authorizing the use of less-than-lethal force in West Philadelphia on May 31st. He did so without acting to ensure that police would not use such force in an aggressive and unlawful manner. As such, the City is responsible for the violation of Plaintiffs' constitutional rights.

131.    To the extent any of the above unconstitutional actions were not decided or authorized by City policymakers, all such actions were the result of decisions by City policymakers to delegate such decision-making authority to the persons who did authorize and direct the unconstitutional conduct.

132.    To the extent any of the individual John Doe defendants acted outside the authorization and direction of City policymakers or the persons to whom policymaking authority was delegated, the City is responsible for failing to properly train, supervise, and/or discipline the officers who so acted. Given the City's known history of improper and excessive force in Black communities, and the City's knowledge about the severe harm that results from tear gas, pepper spray, and rubber bullets, the City's failures in this regard were with deliberate indifference to the risk of constitutional violations.

## SECOND CAUSE OF ACTION
### Equal Protection Violation – 42 U.S.C. § 1983
### (All Plaintiffs v. All Defendants)

133.     Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs.

134.     The actions of all Defendants violated Plaintiffs' clearly established equal protection rights under the Fourteenth Amendment to be free from racially discriminatory policing.

135.     Defendant Officers John Does' use of force against Plaintiffs was motivated at least in part by Plaintiffs' race and prejudices and stereotypes associated with their race – specifically, that Plaintiffs were residents in a predominantly Black neighborhood.

136.     Defendant City of Philadelphia's approval and ratification of Defendant Officers John Does' use of force against Plaintiffs was motivated at least in part by Plaintiffs' race and prejudices and stereotypes associated with their race – specifically, that Plaintiffs were Black and/or were residents in a predominantly Black neighborhood.

137.     The racial motivation for the conduct described in this Complaint is evident in that:

*a.*     PPD officers used racial slurs, including "nigger" and "monkeys," while using pepper spray and rubber bullets against a Black protester.

*b.*     PPD deployed military style weapons against the predominantly Black 52nd Street Community; no other residential neighborhood was singled out for similar treatment in the aftermath of the George Floyd killing.

*c.*     In white communities where there were reports of looting and riots that same weekend and in the weeks that followed, PPD officers declined to use any force or otherwise engage in law enforcement activity.

    ***d.***      Even after acknowledging and apologizing for the use of tear gas on 676, the City failed to similarly acknowledge the harm done to residents of the 52nd Street Community.

138.    As set forth above, the longstanding pattern and practice of racially discriminatory policing by the PPD – including racially biased seizures and use of force–both in the City and in the 52nd Street Community in particular.

139.    As set forth above, this pattern and practice of racially discriminatory policing was known to the City and its policy makers through a series of investigations, lawsuits and consent decrees.

140.    With deliberate indifference to Plaintiffs' equal protection rights, Defendant City of Philadelphia employed and/or permitted a pattern, practice, and/or custom of racially discriminatory policing by PPD officers in which PPD officers stop, seize, and/or use force against Plaintiffs in part because of their race and because of their presence in a predominantly Black neighborhood.

141.    With deliberate indifference to Plaintiffs' equal protection rights, Defendant City of Philadelphia failed to train, discipline, and/or supervise PPD officers who engage in such racially discriminatory policing and who stop, seize, and/or use force against Black Plaintiffs in part because of their race and because of their presence in a predominantly Black neighborhood.

142.    As a direct and proximate result of Defendants' actions, conduct and/or omissions of Defendants as described in this Complaint, Plaintiffs were deprived of their rights under the Fourteenth Amendment.

**THIRD CAUSE OF ACTION**
**Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d),** *et seq.*
**Intentional Discrimination**
**(All Plaintiffs v. Defendant City of Philadelphia)**

143.     Plaintiffs reallege and incorporate by reference all of the preceding paragraphs.

144.     Title VI of the Civil Rights Act of 1964 provides that recipients of federal financial assistance may not discriminate on the basis of race, color, or national origin. 42 U.S.C. § 2000(d).

145.     The City, and the law enforcement activities described in this complaint, are at least partially funded through federal financial assistance. Thus, the City and all of its programs and activities are subject to Title VI.

146.     Title VI bars a recipient's use of race or ethnicity that is in any way motivated by prejudice or stereotype against a particular racial group.

147.     The acts, conduct, and/or omissions of Defendants as described in this Complaint were intended to discriminate on the basis of the race of residents in the 52nd Street Community.

148.     As previously discussed, the evidence in this case supports the inference that the excessive force against residents was administered at least, in part, because the residents of the 52nd Street Community were primarily Black, constituting discrimination based on their race.

149.     The racial motivation for the conduct described in this Complaint is evident in that:

*a.*     PPD officers used racial slurs, including "nigger" and "monkeys," while using pepper spray and rubber bullets against a Black protester.

*b.*     PPD deployed military style weapons against the predominantly Black 52nd Street Community; no other residential neighborhood was singled out for similar treatment in the aftermath of the George Floyd killing.

      *c.*      In white communities where there were also reports of looting and riots that same weekend and in the weeks that followed, PPD officers declined to use any force or otherwise engage in law enforcement activity.

      *d.*      Even after acknowledging and apologizing for the use of tear gas on 676, the City failed to similarly acknowledge the harm done to residents of the 52nd Street Community.

150.    As set forth above, the longstanding pattern and practice of racially discriminatory policing by the PPD – including racially biased seizures and use of force – both in the City and in the 52nd Street Community in particular.

151.    As set forth above, this pattern and practice of racially discriminatory policing was known to the City and its policy makers through a series of investigations, lawsuits and consent decrees.

152.    With deliberate indifference to Plaintiffs' rights under Title VI, Defendant City of Philadelphia employed and/or permitted a pattern, practice, and/or custom of racially discriminatory policing by PPD officers in which PPD officers stop, seize, and/or use force against Plaintiffs in part because of their race and because of their presence in a predominantly Black neighborhood.

153.    With deliberate indifference to Plaintiffs' rights under Title VI, Defendants City of Philadelphia, Mayor Kenney and Commissioner Outlaw have failed to train, discipline, and/or supervise PPD officers who engage in such racially discriminatory policing and who stop, seize, and/or use force against Black Plaintiffs in part because of their race and because of their presence in a predominantly Black neighborhood.

154.    As a direct and proximate results of the acts, conduct and/or omissions of Defendants as described in this Complaint, Plaintiffs were deprived of their rights under Title VI.

## FOURTH CAUSE OF ACTION
### First Amendment Retaliation – 42 U.S.C. § 1983
**(Plaintiffs Anthony James, Anthony Smith, Bedjy Jeanty, Emily Neil, Isa Richardson, Johana Rahman, Judith Palmer, Joseph Moyer, Ketty Richard, Ryan Bing, and Sahar Sadeghi v. All Defendants)**

155.    Plaintiffs Mr. Jeanty, Ms. Richard, Mr. Moyer, Mr. Bing, Mr. Richardson, Ms. Rahman, Mr. James, and Mr. Smith re-allege and incorporate by reference all the preceding paragraphs.

156.    Plaintiffs Mr. Jeanty, Ms. Richard, Mr. Moyer, Mr. Bing, Mr. Richardson, Ms. Rahman, and Mr. Smith engaged in constitutionally protected speech and assembly by participating in peaceful demonstrations about the killings of unarmed Black people at the hands of police officers and discriminatory policing in their community.

157.    Plaintiffs Ms. Neil, Ms. Palmer, Mr. James, and Ms. Sadeghi engaged in constitutionally protected expression by photographing and/or recording the dangerous and unjustified use of force by PPD officers.

158.    At no time were Plaintiffs engaged in any unlawful activity.

159.    The Defendants' use of force against Plaintiffs constituted unlawful retaliation against Plaintiffs by public officials for engaging in activity protected by the First Amendment to the U.S. Constitution.

160.    Defendant Officers John Does' retaliatory use of force described above was the result of specific decisions and authorization made on the part of policymakers for the City of Philadelphia and are responsible for the violation of Plaintiffs' constitutional rights.

161.   Upon information and belief, the City's authorization of the use of military style force against protesters in a residential area was motivated by the race of residents in the 52nd Street Community.

162.   To the extent any of the above unconstitutional actions were not decided or authorized by City policymakers, all such actions were the result of decisions by City policymakers to delegate such decision-making authority to the persons who did authorize and direct the unconstitutional conduct.

163.   To the extent any of the individual John Doe defendants acted outside the authorization and direction of City policymakers or the persons to whom policymaking authority was delegated, the City is responsible for failing to properly train, supervise, and/or discipline the officers who so acted. Given the City's known history of improper and excessive force in Black communities, the City's failures in this regard were with deliberate indifference to the risk of constitutional violations.

### FIFTH CAUSE OF ACTION
**Unreasonable Detention and False Arrest**
**(Anthony Smith v. Defendants City of Philadelphia and John Does 1-100)**

164.   Plaintiff Mr. Smith re-alleges and incorporates by reference all the preceding paragraphs.

165.   For plaintiff Anthony Smith, who was detained, taken into custody and issued a citation, the City of Philadelphia and Defendants John Does 1-100 violated his right to be free from an unlawful seizure without sufficient legal cause in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution.

166.   The City and certain of the John Doe defendants caused the unlawful seizure of Mr. Smith when they detained him without sufficient legal cause for an alleged failure to disperse and

transported him to a precinct in North Philadelphia, only to release him from there, leaving him with no option but to walk back to West Philadelphia late at night and in violation of the Citywide Curfew.

167.    At all times, the conduct of defendants John Does 1-100 was in willful, reckless, and callous disregard of plaintiff's clearly established rights under federal and state law.

168.    All of the unconstitutional actions described above were the result of specific decisions and authorization made on the part of policymakers for the City of Philadelphia, and, as such, the City is responsible for the violation of plaintiff's constitutional rights.

169.    To the extent any of the above unconstitutional actions were not decided or authorized by City policymakers, all such actions were the result of decisions by City policymakers to delegate such decision-making authority to the persons who did authorize and direct the unconstitutional conduct.

170.    To the extent any of the individual John Doe defendants acted outside the authorization and direction of City policymakers or the persons to whom policymaking authority was delegated, the City is responsible for failing to properly train, supervise, and/or discipline the officers who so acted. Given the City's known history of improper and excessive response to peaceful protest activity, the City's failures in this regard were with deliberate indifference to the risk of constitutional violations.

<u>**SIXTH CAUSE OF ACTION**</u>
**State Law Claims – Assault and Battery**
**(All Plaintiffs v. All John Doe Defendants)**

171.    Plaintiffs re-allege and incorporate by reference all the preceding paragraphs.

172.    The actions of Defendant Officers John Does constituted the torts of assault and battery under laws of the Commonwealth of Pennsylvania.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask this Court enter the following in their favor and against Defendants as follows:

1.      To enter a judgment declaring that the Defendants' actions violated Plaintiffs' rights, as protected by the First, Fourth, and Fourteenth Amendments to Constitution of the United States, and other applicable federal statutes.

2.      To award Plaintiffs compensatory damages in an amount to be determined at trial, plus prejudgment interest.

3.      To award Plaintiffs punitive damages against all Defendants in their individual capacities in an amount to be determined at trial, plus prejudgment interest.

4.      To award Plaintiffs reasonable attorneys' fees and costs under 42 U.S.C. §§ 1988 and 1920.

5.      To grant such other and further relief to Plaintiffs as this Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues of fact and damages stated herein.

DATED: September 16, 2020.

Respectfully Submitted,

/s/ Cara McClellan
Cara McClellan
Rachel Kleinman
Liliana Zaragoza
**NAACP LEGAL DEFENSE AND
  EDUCATIONAL FUND, INC.**
40 Rector Street, 5th Floor
New York, New York 10006
T: (212) 965-2200
cmcclellan@naacpldf.org
rkleinman@naacpldf.org
lzaragoza@naacpldf.org

David Rudovsky
David Rudovsky (PA ID No. 15168)
Jonathan H. Feinberg (PA ID No. 88227)
Susan M. Lin (PA ID No. 94184)
**KAIRYS, RUDOVSKY, MESSING,
  FEINBERG & LIN LLP**
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
T: 215-925-4400
drudovsky@krlawphila.com
jfeinberg@krlawphila.com
slin@krlawphila.com

Bret Grote
Bret Grote (PA ID No. 317273)
Jamelia N. Morgan (NY ID No. 5351176)
 *Of Counsel*
Quinn Cozzens (PA ID No. 323353)
**ABOLITIONIST LAW CENTER**
P.O. Box 8654
Pittsburgh, PA 15221
T: (412) 654-9070
bretgrote@abolitionistlawcenter.org
jamelia.morgan@uconn.edu
qcozzens@alcenter.org

*Counsel for Plaintiffs*